79–83 THIRTEENTH AVENUE, LTD., A LIMITED PARTNER-
SHIP ASSOCIATION OF NEW JERSEY, PLAINTIFF-
RESPONDENT, v. TERESA DeMARCO, JOSEPH DeMARCO,
LOUIS DeMARCO AND DORIS DeMARCO, DEFENDANTS-
APPELLANTS.

Argued January 4, 1965—Decided May 24, 1965.

526

*Mr. Jacob Levine* argued the cause for appellants (*Mr. Frank Metro,* attorney).

*Mr. Ronald G. Targan* argued the cause for respondent.

The opinion of the court was delivered by

HALL, J. This is an action at law for a deficiency following the foreclosure of a first mortgage. The primary feature calling for our attention arises from the fact that the instrument evidencing the debt which the mortgage secured was in form a promissory note rather than the conventional mortgage bond. Defendants, who were the mortgagors and makers of the note, claimed by their answer the benefit of *N. J. S.* 2A:50–3, originally enacted as *L.* 1933, *c.* 82, which provides:

"The obligor in any *bond* * * * given after March 29, 1933, may file an answer *in an action on the bond,* disputing the amount of the deficiency sued for. In that event both parties may introduce, in evidence at the trial of the action on the bond, testimony as to the fair market value of the mortgaged premises at the time of the sale thereof in the foreclosure action, and the court, with or without a jury, shall determine the amount of such deficiency, by deducting from the debt secured *by the bond and mortgage* the amount determined as the fair market value of the premises * * *." (Emphasis supplied)

The trial court granted the plaintiff-mortgagee's motion for summary judgment, holding that the statute was not applicable where the mortgage debt was represented by a note, 79 *N. J. Super.* 47 (*Law Div.* 1963), and the Appellate Division affirmed. 83 *N. J. Super.* 497 (1964). Certification was

granted, 43 *N. J.* 271 (1964), this court never having passed on the point.

The background facts are simply stated. In 1958 defendants borrowed $18,000 from plaintiff, at 6% interest, repayable at a fixed sum per month with any remaining balance due at the end of approximately 10 years. The document of obligation was a lengthy printed form captioned "Mortgage Note" which, after setting forth the terms of the loan in the usual language of a promissory note, recited that as security for the payment, the makers had delivered a mortgage of even date in the same principal amount on lands in the City of Newark (a store property equipped for the operation of a fish and live poultry market). It went on to set forth most of the customary provisions found in a mortgage bond, including tax, assessment, insurance, repair, default and acceleration clauses. Default not only in the note terms was provided for but also in any of the covenants and conditions of the mortgage. The instrument concluded with a provision for the payment of attorney fees in the event of institution of suit thereon, with the signatures of the makers under seal—unusual for a note.

Upon default the mortgage was foreclosed in the Chancery Division. The amount found due plaintiff by the judgment therein was $18,898.18. At the Sheriff's sale, the property was bought in by plaintiff for $11,000. The sale price resulted from competitive bidding in which defendants did not participate, although one of them was present. No objection to the sale was thereafter made by defendants in the foreclosure proceeding. See *R. R.* 4:83–5. The deficiency sued for in the instant action and for which judgment was entered following plaintiff's successful motion was $8,481.26, the difference between the sale price and the amount due as fixed by the foreclosure judgment plus Sheriff's fees on the sale.

We feel compelled, reluctantly, to agree that the fair market value provision may not be utilized in a deficiency suit where the mortgage debt is evidenced by a note. We say compelled for two reasons. First, the language of *N. J. S.* 2A:50–

3 and related sections, *N. J. S.* 2A:50–2 to 11, inc., and 22 to 28, inc., is precise, speaking only of "bond," "bond and mortgage" and "action on the bond." Second, these enactments, many adopted as long ago as 1880, have been uniformly construed by the courts and practically acted upon by the bar over a long course of years as inapplicable in situations where no bond is involved. To now reverse that construction judicially might well give rise to claims of the clouding of titles and property rights previously vested in reliance thereon. *Cf. Silver v. Williams, 72 N. J. Super.* 564, 570 (*App. Div.* 1962). Our compulsion is characterized as reluctant because the result is an illogical, incongruous and indeed unjust triumph of form over substance, at least in those cases where the lender relies primarily upon the value of the mortgaged property[1] or perhaps even only where the note, as here, is seemingly nonnegotiable and in all essential respects amounts to the traditional bond except for the ancient, formal language of obligation. We are therefore forced to say that, as far as *automatic* deduction of fair market value where notes have been employed — a practice more and more frequently used these days even by institutional lenders — the change will have to come from the Legislature, and, as the Appellate Division in this case and the knowledgeable local authorities it quoted have so well pointed out, the subject deserves prompt attention by that branch of government. 83 *N. J. Super.*, at *pp.* 498–499. Tischler, "Note Or Bond With Mortgage—Whither the Difference?", 86 *N. J. L. J.* 572 (1963); Eisenberg and Spicer, "Mortgage Deficiencies in New Jersey," 3 *Mercer Beasley L. Rev.* 27 (1934).

Some little explanation of the basis for our conclusion is in order, which will lead into consideration of certain nonlegislative aspects of deficiency recoveries dealt with by the trial court and again explored before us. Prior to 1866 a

[1] The Banking Act of 1948 recognizes the distinction between such loans and those where a mortgage is taken only as collateral security in the connotation of the lending powers of banks. See *N. J. S. A.* 17:9A–64, *subd.* A(1) and 17:9A–70, *subd.* B.

mortgagee, no matter what evidence of debt he held, had a choice of remedies on default which he might resort to cumulatively and successively. He could sue at law on the debt, foreclose the equity of redemption in Chancery or recover possession of the mortgaged premises at law. Equity did not have inherent jurisdiction to enter a decree in the foreclosure for payment of any deficiency. This was an exception to the general rule that, once having obtained jurisdiction, that branch of jurisprudence will proceed to administer full relief, legal as well as equitable. *Montclair Savings Bank v. Sylvester*, 122 *N. J. Eq.* 518, 521 (*E. & A.* 1937). By *L.* 1866, *c.* 384, § 5, however, it was made lawful in any foreclosure suit "to decree the payment of any excess of the mortgage debt above the net proceeds of the sales, by any of the parties to such suit who may be liable either at law or in equity for the payment of the same." This power lasted only until *L.* 1880, *c.* 170, § 1 was enacted. That section, now *N. J. S.* 2A:50–1, forbids the rendering of a judgment in any foreclosure action for any balance which may be due over and above the proceeds of the sale of the mortgaged property. It is to be noted that no distinction is made therein between foreclosures of mortgages securing a bond and those where the debt is evidenced by a note.

By the same 1880 statute, as now found in *N. J. S.* 2A:50–2 after subsequent amendments, the order of proceedings to collect a mortgage debt is specified, but only "[w]here both a bond and a mortgage have been given for the same debt": First, a foreclosure of the mortgage and, second, an action (at law) on the bond for any deficiency remaining after the foreclosure sale.[2]

---

[2] The 1880 statute did away with the "one-action rule" prescribed by the 1866 enactment. Such a rule is in force by statute in a number of states today on the thesis that a single proceeding affords greater protection to the mortgagor. 4 *American Law of Property* (*Casner* ed. 1951), § 16.201. The separation of mortgage proceedings required by the 1880 act is expressly continued by *R. R.* 4:31–2 despite the general policy of the rules since 1948 that all claims shall be disposed of in one proceeding in either the Law or Chancery Division even

As has been earlier pointed out, all statutory enactments except *N. J. S.* 2A:50–1 affecting or limiting suits for a deficiency, enacted through the years commencing in 1880, now *N. J. S.* 2A:50–4, 5, 6, 8 and 22 through 28, are precise in referring only to a "bond" or "bond and mortgage." That this precision was deliberate is evidenced by the fact that a check of the legislative history of the various enactments shows that in the case of many, including the original 1880 statute and the fair value deduction section before us, the bills as introduced were general in their language so as to be applicable to both bonds and notes, but were amended before passage to confine their effect to situations where bonds were given. So there can be no question but that these statutory sections, except for 2A:50–1, were not intended to apply where mortgage notes were utilized. We can only surmise why they were so limited. Perhaps the best guess is that, at the time of passage, loans on the strength of the value of the mortgaged premises were customarily evidenced by a bond and whenever a note was secured by a mortgage, the instrument of obligation was in simple, negotiable form and the security was purely collateral.

 Judicial expressions have been in accord. Without delving into great detail, it is safe to say that as a result the bench and bar have uniformly and for many years believed that the effect, for present purposes, of the pattern created by the legislation is as follows: In the case of default on a bond and mortgage, the mortgage must be foreclosed first in the Chancery Division. Suit may then be brought on the deficiency in the Law Division. The judgment there recoverable will, since *N. J. S.* 2A:50–3, be limited to the difference between the fair market value of the property and the debt re-

where one claim is cognizable only after another claim has been prosecuted to a conclusion. But *cf. Appell v. Reiner*, 86 *N. J. Super.* 515 (*Ch. Div.* 1965), where joinder of a suit on a note with an action to foreclose the mortgage securing the same was permitted for the expressed reason that *N. J. S.* 2A:50–2 applies only to cases in which a bond and mortgage are involved. We express no view on the soundness of that conclusion.

gardless of the price received for the property at the foreclosure sale, the absence of objection to the sale or the equities of the situation. If the debt is evidenced by a note, the mortgagee has a choice. He may foreclose first if, for example, there are subordinate interests he wishes to cut off, and then sue for the deficiency, the amount of which will be determined solely by the difference between the foreclosure sale price and the debt. Or he may simply sue at law for the full amount due on the note, levy on the mortgaged property in execution of the judgment, and then seek satisfaction out of the defendant's other assets for the difference between the amount realized at the execution sale and the judgment. Under either procedure in the case of a note, he may seemingly himself acquire the property at the judicial sale for a nominal figure (if there are no other bidders), and still collect the full deficiency out of his debtor's other property during the next 20 years. See *Chodosh v. Schlesinger,* 119 *N. J. L.* 405 (*E. & A.* 1938); *Verona Trust Co. v. Bergdal,* 129 *N. J. L.* 458 (*E. & A.* 1943); *Updyke v. Van Orden,* 95 *A.* 547 (*Sup. Ct.* 1915); *Asbury Park and Ocean Grove Bank v. Giordano,* 3 *N. J. Misc.* 555, 129 *A.* 202 (*Sup. Ct.* 1925), affirmed o. b. 103 *N. J. L.* 171 (*E. & A.* 1925); *Wildwood Title and Trust Co. v. Geisenhoner,* 11 *N. J. Misc.* 871, 168 *A.* 751 (*Sup. Ct.* 1933); *Silver v. Williams, supra,* 72 *N. J. Super.* 564; Tischler, *supra* (86 *N. J. L. J.* 572).

■■ The mere recital of the differing consequences dependent upon whether a note or a bond is used demonstrates the incongruity and injustice of statutory coverage in one case and not in the other, especially where the lender relies primarily on the value of the mortgaged premises. The discrimination is even more pointed up when we consider the frequent statements that foreclosure procedure statutes and the various measures regulating deficiencies were intended for the benefit of mortgagors, to prevent oppression of them and to make the mortgaged premises primarily answerable for the debt so secured. See, *e. g., Knight v. Cape May Sand Co.,* 83 *N. J. L.* 597, 601–602 (*E. & A.* 1912); *Montclair*

Savings Bank v. Sylvester, supra, 122 N. J. Eq., at p. 521; 4 American Law of Property (Casner ed. 1951), § 16.202. Nor in any consideration of this problem can we overlook the broad equitable concept that a mortgagee is not entitled to recover more than the full amount of the mortgage debt. See, e. g., Federal Title and Mortgage Guaranty Co. v. Lowenstein, 113 N. J. Eq. 200, 208, 209 (Ch. 1933); Fidelity Union Trust Co. v. Multiple Realty and Construction Co., 131 N. J. Eq. 527, 541 (Ch. 1942). This fundamental principle formed the basis of the nonstatutory doctrine, commonly named after the case first cited, developed by the Court of Chancery in bond and mortgage foreclosures during the great depression of the 1930's before N. J. S. 2A:50–3 came into practical usefulness. Speaking generally, the doctrine as ultimately refined required a credit, under certain conditions which we need not go into, of the fair value of the property on the amount found due in the foreclosure because collapsed economic conditions had destroyed all market for real estate and made it impossible to secure anything beyond a nominal bid at a judicial sale. The doctrine was founded in the court's inherent power to refuse confirmation of such a sale or prescribe conditions therefor on equitable bases.

This brings us to a consideration of whether analogous nonstatutory relief is available today with respect to a note mortgage deficiency. The question was raised before the trial judge in this action by reason of statements in the affidavits of both sides submitted on the motion for summary judgments (which we permitted the defendants to supplement following the oral argument in this court). The judge decided in effect that the mortgagor may today interpose the equities of the Lowenstein doctrine to seek reduction of the deficiency which might be sued for following the foreclosure of a note mortgage, but that such relief had to be sought in the foreclosure proceeding by objection to the sale, R. R. 4:83–5. He further found that, in any event, defendants had shown no equitable basis to reduce the amount demanded in this suit.

■■ We agree that a note mortgagor today, although prevented from automatic application of the fair value deduction statute with reference to a deficiency, may obtain review and relief, including reduction of the difference between the mortgage debt and the amount realized at the foreclosure sale, on appropriate equitable bases. We further acquiesce in the conclusion that the forum for such relief should be only the foreclosure action by the procedure of objection to the sale. We say this because the evidence can there be promptly presented in a court of equity and especially since the appropriate relief may be the ordering of a resale which could not well be done months or even years later by the law court in the deficiency suit.

■■ We do feel, however, that the trial judge was too restrictive in limiting the requisites for such relief to the criteria laid down in *Lowenstein.* 79 *N. J. Super.,* at *pp.* 58–59. Those requisites derived from and were built around the economic conditions of a depression era. Today they have lost a good part of their pertinency. General economic conditions are the reverse of those in the 30's. Times are booming, mortgage loan funds for refinancing are plentiful and lenders are competing for investments. There is an active market for most kinds of real estate and judicial sales attract prospective purchasers who bid competitively for many properties. While it would be unwise for us to attempt to spell out abstractly detailed criteria for deficiency relief, since each case will have to be decided on its own facts, we may mention some considerations which we believe will have pertinency. In this connection it may be initially noted that the fair market value deduction statute is indicative of a broad legislative policy that mortgagors should not be personally liable for more than the difference between that figure and the mortgage debt. Under any circumstances the mortgagor or anyone else liable for the debt should have to show as a prerequisite to any relief that he is personally unable to pay it by some means. Otherwise a solvent debtor would be able to unload an unprofitable investment on his mortgagee. Of course, the party seeking

relief will also have to show with precision the fair market value of the premises in question and thus that the price realized at the sale was entirely inadequate. It would be impolitic for us to prescribe here the kind of relief which should be granted. Again, that will depend on the individual factual situation. Another sale, allowance of a right to redeem on terms, reduction of the amount for which a deficiency action may be brought or some other measure or none at all may be the appropriate answer depending on the particular circumstances developed by the proofs.

Since foreclosure of the note mortgage was the initial proceeding in the instant case rather than suit on the note followed by execution levy on the mortgaged premises, we should not deal with the rights or remedies of a mortgagor if the latter course were the one followed. In *Silver v. Williams, supra,* 72 *N. J. Super.,* at *p.* 570, the Appellate Division said that no case or statute in this State forbids the mortgagee from levying execution upon the mortgaged premises and, without citation of authority, that there was apparent judicial recognition of the *prima facie* regularity of the procedure. This court, however, has never expressly passed on it. It is enough to note here that the matter may well not be free from doubt. Among other troublesome aspects, the procedure involves summary extinction of the right of redemption, a right otherwise rather zealously protected by the law. See the discussion in Tischler, *supra* (86 *N. J. L. J.* 572).

Finally, we are thoroughly satisfied that, in any event, the defendants here have made out no case at all for equitable intervention in their behalf. The only proof of the fair market value of the property was a vague, nonexpert, conclusory suggestion and only two of the four swore that they had insufficient resources to pay the mortgage debt or protect their interests.

The judgment of the Appellate Division is affirmed.

FRANCIS, J. (concurring). I concur in the result announced in Justice Hall's opinion. The discussion therein with respect

to possible differences in the rights and obligations of mortgagors who have executed notes and mortgages to secure loans on their property *vis-a-vis* those who have given bonds and mortgages for the purpose, impels me to add some further observations.

In the run-of-the-mill mortgage transactions, a great mass of which involves ordinary homeowners, the factor motivating the lender is the value of the property offered as security for the loan. It is common knowledge that persons and corporations in the mortgage lending business usually limit the size of their loans to a certain percentage of the market value of the property. This practice has a twofold purpose: (1) to furnish reasonable assurance to the lender that in the event of default, the security provided by the property will probably be sufficient to make him whole, and (2) to leave the mortgagor sufficient equity in the property above the mortgage to provide substantial incentive for the making and continuance of payments toward satisfaction of the obligation. In short, from its inception the basic nature of the transaction is such that the parties regard the land as the primary security for the debt, and primarily answerable for its satisfaction. Since the land plays such a paramount role it seems reasonable to say in terms of equitable principles that a defaulting mortgagor-owner ought to have an equity in the transaction calling for utilization of the fair value of the land in diminution of the debt.

The Legislature has recognized the equity where the loan to the property owner is represented by a bond and mortgage. In this situation, in the event of default, not only must the mortgage be foreclosed first and the premises sold, but in the event of a deficiency on a *bona fide* sale thereof, and a suit to obtain a judgment for the amount of the deficiency, the mortgagee must give credit to the mortgagor in such suit for the fair market value of the premises. *N. J. S.* 2A:50-2 and 3.

The statute gives recognition to the true character of the transaction and the usual intention of the parties in entering into it. Also it establishes that the public policy of the State

is to require mortgagees to look primarily to the property for the satisfaction of the obligation, and to protect property owners as far as possible from deficiency judgments.

It is fair to say that at the time of enactment of the statute the prevalent practice of mortgage money lenders was to secure themselves by a bond and mortgage. That undoubtedly accounts for the fact that the law was cast in terms of bond and mortgage transactions, and contained no reference to the very same kind of a loan evidenced by a note and mortgage. I cannot believe that a Legislature, motivated as it was by considerations affecting the general welfare of homeowners, and intending to safeguard them against deficiencies on foreclosure sales in excess of the fair value of their property, deliberately set out to protect only those mortgagors who had given bonds and mortgages to secure loans on their property, and to exclude from the protection those whose identical obligations were secured by notes and mortgages. I cannot attribute such a motive to the lawmakers; it had to be inadvertent. If the legislative policy is applicable to one instrument, clearly it ought to be applicable to the other. See Tischler, "Note or Bond With Mortgage—Whither the Difference?," 86 *N. J. L. J.* 572 (1963).

We can take judicial notice that the statute is being emptied of its salutary public purpose at a constantly increasing pace. Mortgage lenders are turning away from the time-honored custom of bond and mortgage. Now to avoid and to circumvent the strictures of the statute they alter the form of the loan transaction. The note, with an acceleration clause, is being substituted for the bond and by that simple change the beneficent effect of the legislation is said to be extinguished. On default in payments there is no statutory obligation to foreclose the mortgage before proceeding on the note. Taking advantage of the acceleration provision in the note, suit is brought thereon and judgment taken for the full amount of the debt then due. The noteholder-judgment creditor's thesis is that after execution is levied, the mortgaged premises may be sold subject to the mortgage; the sale is

deemed to cut off the mortgagor's equity of redemption, and the only obligation of the judgment creditor to the mortgagor is to give credit on the judgment for the sum produced at the execution sale. Further the position of the noteholder-judgment creditor is that the purchaser at the sale is substituted in effect for the original mortgagor. Or if the judgment creditor buys in himself at the execution sale, he may prevent a merger of the mortgage and the deed, and continue the mortgage as an open encumbrance against the property. *Cf. Silver v. Williams,* 72 *N. J. Super.* 564, 570 (*App. Div.* 1962).

The many inequities and financial burdens which may be imposed upon a note and mortgage debtor as contrasted with a bond and mortgage debtor, are obvious. Such burdens and inequities are visited upon homeowner mortgagors, the vast majority of whom do not have the slightest appreciation of the difference between signing a note and signing a bond, to secure which they are giving the mortgage. Nor do they realize that the mortgage holders are employing a form of transaction aimed at nullifying the legislative policy designed to give property owners a measure of protection, and at increasing substantially the burden being assumed.

Without discussing remedies at length, and the means of accomplishing them, it seems sufficient for present purposes to say that absent additional legislation to equate bond and note in the ordinary mortgage transaction, fair application of equitable principles demands:

(1) That if a third person buys in, subject to the mortgage, at an execution sale of the mortgaged premises under the judgment creditor's (noteholder's) judgment, it should be assumed that the sum paid for the mortgagor's equity of redemption represents its value above the outstanding indebtedness on the mortgage. Consequently the mortgage and the judgment should be deemed discharged as between the original parties;

(2) If the mortgagee-judgment creditor buys in at the sale, thereby cutting off the equity of redemption, it should be deemed that the security equals the mortgage or judgment

debt, and thus both become satisfied. See *Lydecker v. Bogert,* 38 *N. J. Eq.* 136, 141–142 (*Ch.* 1884); *Osborne, Mortgages,* § 300, *p.* 862 (1951); 4 *American Law of Property* (*Casner ed.* 1952), § 16.167;

(3) As a minimum measure of relief in either (1) or (2), equity should require that in any execution sale on a judgment resulting from the usual note and mortgage transaction, the mortgagor should be given a credit of the fair value of the property at the time of the entry of judgment.

Many commentators have said that when injustice presents itself, the ingenuity of equity in devising means of achieving justice is almost boundless. I have no doubt that in appropriate cases involving notes and mortgages the genius of equity will assert itself to the proper end. The remedy could be facilitated, of course, by the hand which recognized the public need for *N. J. S.* 2A:50–2 and 3. But that type of remedy rests entirely in the judgment and discretion of the legislative branch of the government.

Francis, J., concurring in result.

*For affirmance* — Chief Justice Weintraub, and Justices Jacobs, Francis, Proctor, Hall, Schettino and Haneman —7.

*For reversal*—None.